# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

BRAD JENNINGS,

                Plaintiff,

v.

DANIEL F. NASH,
JAMES MICHAEL RACKLEY
DALLAS COUNTY, MISSOURI,
GEORGE KNOWLES,

                Defendants.

Case No. 6:18-cv-03261-NKL

## ORDER

Before the Court are three motions for summary judgment by Defendant Daniel F. Nash,
Doc. 153, Defendant George Knowles, Doc. 148, and Defendants Dallas County and James
Rackley, Doc. 150. For the reasons discussed below, the motions for summary judgment by
Defendants Knowles, Rackley, and Dallas County are granted. Defendant Nash's motion for
summary judgment is denied as to Count I, but granted on Counts II, III, VI, and VII.

## I.  BACKGROUND

This case arose out of the 2006 death of Lisa Jennings, the wife of Plaintiff Brad
Jennings. After a joint investigation by Dallas County Sheriff's Department and Missouri State
Highway Patrol, Brad Jennings was convicted of Lisa's murder and was sentenced to twenty-five
years in prison. In 2018, the Circuit Court of Texas County, Missouri, vacated Jennings'
convictions due to a *Brady* violation. Jennings subsequently filed this lawsuit alleging
Defendant law enforcement officers Nash, Knowles, and Rackley, as well as Dallas County,

violated his constitutional rights during the investigation of his wife's death and his subsequent prosecution. Specifically, Jennings alleges the following causes of action:

- Count I: 42 U.S.C. § 1983 Procedural Due Process claim against Defendants Nash and Rackley for deliberate suppression of exculpatory evidence
- Count II: 42 U.S.C. § 1983 Substantive Due Process claim against Defendant Nash for fabrication of evidence
- Count III: 42 U.S.C. § 1983 Conspiracy to deprive constitutional rights claim against Defendants Nash and Rackley
- Count IV: 42 U.S.C. § 1983 Failure to Supervise claim against Defendant Knowles
- Count V: 42 U.S.C. § 1983 *Monell* liability claim against Defendant Dallas County and Rackley in his official capacity
- Count VI: Common law false arrest claim against Defendant Nash
- Count VII: Common law malicious prosecution claim against Defendant Nash

All Defendants now seek summary judgment as to each claim against them.

## II.   FACTS[1]

### a.   Death of Lisa Jennings and Dallas County Investigation

On December 25, 2006, Dallas County Sheriff's Department responded to a call that Lisa Jennings had died of a gunshot wound to the head. Lisa Jennings' husband, Brad Jennings ("Jennings" or "Brad"), informed officers that he had been out working in his garage, and upon returning to the house, he found his wife in their closet with a gunshot wound. Doc. 151-2 (MSHP investigative report excerpts), AGO000213–17. Upon finding her, Jennings held her in his arms prior to calling the authorities. *Id*. Dallas County officers, including Sheriff Michael Rackley and Deputy Scott Rice, collected evidence, took photos, and spoke to witnesses at the scene, Doc. 151-8 (2017 habeas proceeding transcript), p. 240, as well as performed a gunshot residue (GSR) test on both Lisa Jennings' and Brad Jennings' hands, Doc. 151-2, AGO000213–17. Lisa's hand tested positive for GSR, but Brad's hands tested negative for GSR. *Id*. An

---

[1] All facts are viewed in the light most favorable to the nonmoving party. *Cottrell v. Am. Family Mut. Ins. Co., S.I.*, 930 F.3d 969, 971 (8th Cir. 2019)

autopsy concluded that the cause of death was a contact gunshot wound to the head and that Lisa Jennings was intoxicated at the time of her death. Doc. 151-2, AGO0000289. Dallas County officials, including Rackley, Rice, the local prosecutor, and the coroner, all determined that Lisa Jennings had committed suicide. Doc. 151-8, p. 257. Her death certificate listed "suicide" and "self inflicted gunshot wound to the head" as the cause of death and noted that she had elevated blood alcohol levels. Doc. 151-3 (Lisa Jennings death certificate).

### b. Missouri State Highway Patrol Investigation

On January 9, 2007, Lisa Jennings' sister visited the Missouri State Highway Patrol (MSHP), where she spoke to Dan Nash, a Sergeant in the MSHP Division of Drug and Crime Control. Doc. 151-2, AGO000218. Lisa's sister expressed doubts that the cause of Lisa's death was suicide and requested that MSHP continue the investigation into Lisa's death. *Id*. Nash contacted Rackley and requested to review the case, though the two did not know each other and had not previously worked together. Doc. 151-5 (Rackley 2019 deposition), p. 44. Rackley agreed and provided Nash with the Dallas County Sheriff's Department's reports and crime scene photos from the Lisa Jennings investigation. Doc. 151-7 (Jennings 2009 criminal trial transcript), p. 548. Among other bloodstain patterns, the crime scene photos depicted a single drop of blood on Lisa Jennings' dominant hand. *Id*. at 575. Nash determined that the single drop of blood was inconsistent with suicide, because the gunshot wound should have caused a significant amount of blood impact stain on her hand and arm rather than a single drop. *Id*. At the time, Nash had not taken a basic bloodstain pattern analysis course. Doc. 158-24 (Nash 2008 Certificate of Training for Basic Bloodstain Pattern Analysis). Nash then sought the opinion of MSHP Sergeant Roger Renken, who had more experience with bloodstain pattern analysis, though Renken did not consider himself an expert. Doc. 151-8, p. 229. Renken also determined

the bloodstain patterns were more consistent with homicide than suicide.  Doc. 151-2,

AGO0000458–60.

Nash spoke to Rackley about his conclusions, and Nash and Rackley determined that

MSHP and Dallas County would re-open the case and begin a joint investigation into the death

of Lisa Jennings, with Nash as the lead investigator for MSHP and Rackley as the lead

investigator for Dallas County Sheriff's Department.  Doc. 151-6 (Nash 2019 deposition), p. 106.

MSHP assumed control of all of the physical evidence collected in the case and became the

repository for all investigative reports.  Doc. 151-8, p. 243.  Over the following months, Nash,

Rackley, and other officers on the investigative team participated in regular meetings and

communicated updates on the investigation.  The team conducted interviews with Lisa's friends

and family, asking about the state of the Jennings' marriage, the alleged history of abuse,

whether Lisa was making plans to move out of the Jennings' home, whether Lisa was suicidal or

depressed, and whether Lisa was having an affair.  *See generally* Doc. 151-2.

Around March 15, 2007, Nash created a crime scene reconstruction report, wherein he

detailed his basis for determining Lisa Jennings' death was not a suicide but rather a homicide

perpetrated by Brad Jennings, including the bloodstain patterns, the history of marital conflict

between Lisa and Brad, and the lack of evidence of an intruder.  Doc. 154-2 (Crime Scene

Reconstruction).  The report also included two fillable forms attached as appendices that noted

Nash's conclusions as to whether the evidence corresponding to a list of factors was consistent

with or inconsistent with suicide, and whether any evidence of homicide was consistent with the

husband or an intruder as the perpetrator.  *Id*.  Nash determined that only four of the sixteen

factors were consistent with suicide, whereas ten of the factors were not consistent with suicide.

*Id*.  One of the factors listed as "Not Consistent w/ Suicide" was "Past Suicide attempt."  *Id*.

However, Dallas County then-Deputy Scott Rice contends that upon seeing Nash's report during a meeting with Nash and Rackley, he informed both Nash and Rackley that when Rice and Lisa Jennings were teenagers, Lisa had attempted suicide. Doc. 158-30 (Rice 2017 deposition), p. 11. Rackley concedes that Scott Rice informed him that Lisa previously attempted suicide, and he believes Nash knew this fact as well, although Nash disputes having known of the prior attempt. Doc. 151-5, pp. 112-14; Doc. 158-18 (Nash 2017 deposition), p. 35. Nash did not change the designation of "Past Suicide attempt" as "Not Consistent w/ Suicide" on the crime scene reconstruction report. Doc. 154-2.

On March 26, 2007, Nash and Rackley performed a consent search of Jennings' home, seizing the black robe and slippers Jennings wore the night of Lisa's death. Doc. 158-3 (full discovery produced to Jennings prior to 2009 criminal trial), AGO0000462. Nash and Rackley discussed sending the robe in for forensic testing, and Nash later sent the robe to the MSHP crime lab for blood and GSR testing. Doc. 151-6, p. 108. Lab records indicate that Nash reiterated to the lab over the phone on June 15, 2007, that he wanted GSR testing performed on the items. Doc. 158-16 (MSHP crime lab case notes), p. 2.

The lab found that the robe tested positive for Lisa Jennings' blood but negative for GSR. Doc. 158-4 (forensic testing results on robe). Although the lab's typical practice was to send by U.S. mail copies of all results to the requesting agency, Doc. 158-19 (interview with MSHP lab technician Nicholas Gerhardt), pp. 5–6, lab records indicate that on July 12, 2007, Nash also requested over the phone that all testing reports be faxed to MSHP Troop D headquarters, where Nash was stationed. Doc. 158-15 (MSHP crime lab case note). The lab's fax confirmations and case records indicate that lab results were faxed to Troop D on July 12 and July 17, 2007, per Nash's request, and that a phone call took place between Nash and a lab technician on July 17,

2007, regarding the faxed reports. Doc. 158-14 (MSHP crime lab fax confirmations); Doc. 158-16; Doc. 158-17 (MSHP crime lab case note). Nash received the positive blood test results but denies ever receiving the negative GSR results. Doc. 158-18, pp. 14–15. While the positive blood testing was later disclosed to the defense and used as a basis for Jennings' arrest and the prosecution's case at trial, the negative GSR results were never provided to the defense or the prosecutor.

On January 9, 2007, Dallas County seized a computer and two hard drives from the Jennings' residence, Doc. 158-3, AGO0000287, and on February 8, 2007, MSHP performed an imaging of the data contained on one of the hard drives, Doc. 158-29 (MSHP Computer Forensics Unit summary of computer examination dated 2/8/2007). On April 25, 2007, Nash seized two thumb drives from the Jennings' residence, Doc. 158-3, AGO0000398, though there is no record of Nash submitting the thumb drives for forensic examination. Doc. 158-26 (MSHP Computer Forensics Unit Officer Cordia 2019 deposition), p. 13.

On July 26, 2007, Nash prepared a probable cause statement in support of Jennings' arrest. Doc. 154-16 (Nash 2007 probable cause statement). The report stated that the facts supporting probable cause included the Jennings' marital strife, the bloodstain pattern analysis, statements from Lisa Jennings' daughter that contradicted Brad's version of events and that indicated he appeared to have "cleaned up" after the shooting, the positive blood results from the robe, and the fact that the gun used belonged to Brad Jennings. *Id*. The probable cause statement did not include any mention of Lisa Jennings' prior suicide attempt or the negative GSR results. *Id*. On July 27, 2007, a warrant was issued by the Dallas County Circuit Court for Jennings' arrest. Doc 154-17 (Jennings' criminal trial docket). Jennings was charged with murder and armed criminal action. Doc. 151-7, p. 1.

### c. Criminal Trial of Jennings

Jennings' trial for murder and armed criminal action began on August 17, 2009.  Doc. 151-7.  The evidence against Jennings included Nash's testimony as a blood stain pattern analyst as well as witnesses describing Brad and Lisa's tumultuous marriage, Lisa's plans on moving out of the Jennings' home, and that Lisa's activities prior to her death were not indicative of someone who was suicidal.  *Id*. at 239–89, 444–501.  Rackley testified about Dallas County's involvement in the case, including the processing of the scene, that Dallas County originally determined Lisa Jennings' death was a suicide, and that prior to MSHP's involvement, Rackley did not feel strong enough to ask the prosecutor to pursue charges against Jennings.  *Id*. at 380–443.  Nash testified as to his initiation of the homicide investigation after Dallas County's suicide determination, the bloodstain pattern analysis which he contended was more indicative of a homicide than a suicide, the blood evidence on Jennings' robe, and a pre-arrest interview he and Rackley conducted with Jennings.  *Id*. at 545–650.  The forensic examiner testified detailing the autopsy results, *Id*. at 329–79, and lab technicians testified regarding the positive GSR test on Lisa's hands and the negative GSR test on Brad's hands, *Id*. at 516–532, as well as the DNA testing of the blood on Jennings' robe, *Id*. at 680–715.  During closing arguments, Jennings' attorney remarked at the fact that MSHP had the robe in custody for over two years, and yet they had not performed a GSR test.  Doc. 154-10, p. 17.

On August 19, 2009, the jury found Jennings guilty of murder in the second degree and armed criminal action, and he was sentenced to twenty-five years in prison.

### d. Post-Conviction Relief

Jennings appealed his conviction, Doc. 154-3 (*Missouri v. Jennings*, 322 S.W.3d 598 (Mo. Ct. App. 2010)), and sought post-conviction relief claiming ineffective assistance of

counsel, Doc. 154-4 (*Jennings v. Missouri*, 406 S.W.3d 52 (Mo. Ct. App. 2013)), all to no avail. In 2015, Jennings' attorney filed a public records request specifically seeking GSR results from the MSHP crime lab for the Jennings case, and the request was successful. The negative GSR results were finally disclosed.

Based on these undisclosed GSR results, Jennings filed a Petition for Writ of Habeas Corpus in the Circuit Court of Texas County, and on February 8, 2018, the Circuit Court of Texas County issued its Order granting Jennings' Petition. Doc. 154-10 (Circuit Court of Texas County 2/8/2018 Order). The Circuit Court found that the failure to disclose the negative GSR results constituted a violation of the principles in *Brady v. Maryland*, 373 U.S. 83 (1963), because the results were exculpatory, impeaching, and material to the outcome of the case. *Id*. At Jennings' criminal trial, the prosecution had advanced the theory that Brad's hands were negative for GSR, because he had washed his hands, and that the atomized blood detected on his robe indicated that he was in fact present for the shooting. The Circuit Court reasoned that evidence that his robe tested negative for GSR would have "substantially corroborated the inference of his innocence from the negative [GSR] on his hands." *Id.* at 7, 10. Further, the lack of GSR on the robe combined with the presence of detectable blood "support[ed] an inference that the robe was not washed or significantly molested" and that the blood detected had come from his holding Lisa upon finding her dead, making the lack of GSR evidence significant. *Id.*

In assessing the materiality of the evidence, the Circuit Court determined the evidence presented at Jennings' criminal trial was "thin" and "circumstantial." *Id*. at 15. The Circuit Court noted that the trial judge had remarked in ruling on Jennings' motion for a new trial that "this is a circumstantial evidence case." *Id*. at 4. As the case was largely based on Nash's and Renken's bloodstain pattern analysis, the Circuit Court considered these opinions as well as

Jennings' proffered bloodstain pattern expert and determined Nash's and Renken's bloodstain pattern analysis was "unsubstantiated and illogical opinion evidence" that "as presented at trial, does not constitute strong, credible evidence of Petitioner's guilt." *Id*. The remaining evidence was testimony regarding Brad's bad character, indicating Lisa's actions prior to death were not consistent with someone seeking to end their life, indicating Lisa was planning on leaving Brad, and describing the argument between Brad and Lisa the day she died. *Id*. at 16. Reviewing the trial record, the Circuit Court found that the non-disclosure of the exculpatory GSR results was sufficient to undermine the verdict and vacated Jennings' convictions. *Id*. The Missouri Attorney General declined to retry Jennings for Lisa's death. Doc. 158-22 (Memorandum of *Nolle Prosequi*).

### e.  Materials Relating to Bridgette Maddux and Scott Rice

Two weeks prior to Jennings' habeas hearing, on October 23, 2017, Jennings' counsel received the following email from the Assistant Attorney General:

> Within the last few days, our office discovered that Sheriff Scott Rice was given a polygraph examination conducted by the Missouri State Highway Patrol in which he was asked questions related to the investigation regarding the death of Lisa Jennings. These documents were contained in a file maintained by former Sheriff Mike Rackley, who gave them to Dallas County Clerk Stephanie Hendricks.

Doc. 158-7 (email from Assistant Attorney General Coulter to Jennings' counsel). The file containing the information about Scott Rice was then provided to Jennings' counsel.

The file consisted of a series of documents from the personnel file of Scott Rice, who during the Jennings investigation was a Dallas County deputy. Rice participated in the initial Dallas County Jennings investigation and agreed with Rackley and the coroner that Lisa Jennings' death had been a suicide. Doc. 151-8, 142–149. When MSHP first became involved and shifted the focus of the investigation to homicide, Rice informed Rackley that he still

believed Dallas County's suicide determination was correct and felt that Nash's bloodstain pattern interpretation was insufficient evidence to begin a homicide investigation. Doc. 151-8, pp. 166–67. Rice requested to not be involved in the joint homicide investigation, and Rackley agreed. *Id*. Jennings argues the Scott Rice personnel documents indicate Rackley and Nash conspired create a false statement attributed to Bridgette Maddux that was then used to investigate Rice, and ultimately to initiate disciplinary action against Rice, all in an effort to discredit him as a potential defense witness due to his disagreement with the homicide investigation. The following facts have been alleged by Jennings to be relevant to his claims.

### (1) First Bridgette Maddux Conversation – Nash False Report #1

It is undisputed that on May 3, 2007, Nash and MSHP Officer Crain interviewed Maddux as part of the homicide investigation. Bridgette Maddux was the schoolteacher of Lisa and Brad's son. Doc. 151-2, AGO0000230. Nash's interview report indicates that Maddux stated that she had known Lisa Jennings since high school and believed her to be a good person and mother, that she had heard Brad Jennings was rough, abusive, and controlling, that Lisa was planning on leaving and divorcing Brad after the holidays, and that "she had also heard Lisa Jennings was having an affair with a Dallas County Deputy. We then inquired if she had heard who this person was and Maddux advised Scott Rice." *Id*. This May 3, 2007, interview report was disclosed to Jennings prior to his trial, but neither the report nor anything in it was used during Jennings' trial by either party.

Jennings' habeas hearing was held in November 2017. Maddux testified there that in 2007 she did not personally know either Lisa or Brad, and that she would not have made the statements regarding their marriage to Nash. Doc. 151-8, p. 178–79. She further testified that

during the interview, it was Nash who raised the rumored affair between Rice and Lisa Jennings, and she merely confirmed that she had heard the rumor prior to the interview.  *Id*. at 180–81.

### (2) Investigation into Scott Rice allegedly triggered by Nash's false report about his interview with Bridgette Maddux

Upon hearing of the rumored affair between Rice and Lisa Jennings from the Maddux interview as well as from an anonymous letter, Doc. 152-1 (Scott Rice personnel file excerpts), AGO000594–95, Rackley requested MSHP Officer Rogers to conduct an interview with Rice, which occurred on July 29, 2017.  *Id*.  Rice stated that he dated Lisa when he was sixteen, but that they did not have an affair and was angered that someone had accused him of this.  *Id*.  The report of this interview was disclosed to Jennings before his trial.  Despite Rice's denials, on August 17, 2007, Rackley wrote a letter to the Superintendent of MSHP Colonel James Keathley relaying the recent allegations of Rice's involvement with Lisa and requesting that MSHP investigate further due to Dallas County's involvement in the death investigation.  Doc. 152-1, at AGO000561.  Colonel Keathley responded stating that MSHP "does not normally investigate internal police matter such as extra marital affairs," but that they would "provide a polygraph examination to Deputy Rice on the issue of his knowledge or involvement in the suspicious death of Lisa Jennings."  *Id*. at AGO000563.

Rice took a polygraph test administered by MSHP inquiring as to Rice's knowledge of and involvement in the potential homicide of Lisa Jennings, but the results were inconclusive.  *Id*. at AGO000596.  Over the next six weeks, Rackley repeatedly requested that Rice take a second polygraph or risk facing discipline for insubordinate behavior.  *Id*. at AGO000565–73.  In the series of letters and memoranda taken from Rice's personnel file documenting Rice and Rackley's communication during this period, Rice repeatedly reiterated to Rackley that he believed Rackley was pursuing the investigation against him because Rice planned to run against

Rackley for Dallas County Sheriff in 2008.  *Id*. at AGO000569-570, AGO000572.  In two letters from Rice's attorney to Rackley on October 22 and October 24, 2007, Rice's attorney reiterated Rice's belief that Rackley's investigation was politically motivated.  *Id*. at AGO000574–75, AGO000614.

### (3) Second Bridgette Maddux Conversation – Nash False Report #2

During this period, Nash reported to Rackley that he had received a call on August 21, 2007, from Bridgette Maddux in which she stated that Rice had confronted her about her May 3, 2007, interview that discussed Rice's rumored affair with Lisa Jennings.  *Id*. at AGO000567.  On October 17, 2007, Nash wrote an interoffice memorandum to Rackley detailing this alleged conversation per Rackley's request.  *Id*. at AGO000616.  Nash wrote that "Maddux stated that Scott Rice knows about her conversation with me and had confronted her about the said conversation.  Maddux stated that Rice is very upset with her and that her child is in class with Rice's wife.  Maddux was very upset that Rice is telling people around town telling that she is trying to ruin his life."  *Id*.

Maddux denies having ever made those statements.  Doc. 151-8, pp. 181–82.  Though Maddux does not recall the precise dates, at some point during this time period Maddux was informed of a rumor that she had made a complaint against Rice for harassing her.  Doc. 151-13 (Maddux 2019 deposition), pp. 16–17.  Maddux claims she informed Nash once and repeatedly conveyed to Rackley that she had never lodged a complaint against Rice and that Rice had never confronted her.  Doc. 151-8, p. 183; Doc. 151-13, pp. 24–34.  Despite this, Rackley continued to contact Maddux and to say he had been given information that Maddux made a complaint that Rice was harassing her.  Doc. 151-13, pp. 24–34.  Maddux perceived Rackley as "trying to convince [her] that Scott was harassing or whatever [Rackley] was claiming him to be doing.

And [Maddux] assured [Rackley] that [she] did not in any way feel that way." *Id*. at 36.

Rackley's records reflect that sometime around October 10, 2007, Rackley began reprimanding

Rice for this alleged confrontation with Maddux, claiming that Rice had been insubordinate in

light of Rackley's prior order to Rice to not interfere with the MSHP investigation into his

rumored involvement with Lisa. Doc. 152-1, AGO000567–69.

Although Maddux does not remember the dates that she first informed Rackley that Rice

had not confronted her, the Rice personnel documents indicate that Rackley was on notice at

some time prior to October 24, 2007. On this date, Rice's attorney contacted Rackley regarding

the alleged Maddux complaint against Rice with the letter subject heading, "Rice v. Mike

Rackley; Employment issue." Doc. 152-1, p. AGO000614–15. The letter noted that Maddux

had "requested a copy of the report of Nash of a purported complaint against Mr. Rice, and it has

not been provided. Ms. Maddux has personally informed you that the purported complaint made

by her against Mr. Rice is a falsification." *Id*. The following day, on October 25, 2007, the

assistant to the Dallas County prosecutor Wayne Rieschel emailed Rackley to inform him that

"John Maddux called this morning and left the message for Wayne that he wanted for you to stop

calling/harassing him and Brigitte and if it did not stop, he would consider filing suit and he

would be discussing it with the county commissioners." *Id*. at AGO000576. At some point

during this period, Maddux's state representative also contacted Rackley on her behalf after she

requested that he obtain a copy of the complaint attributed to her. Doc. 151-13, pp. 21–23. The

Representative reported to Maddux that during his conversation with Rackley, Rackley held up

piece of paper which Rackley stated was a complaint made by Maddux against Rice, but that

Rackley would not give the Representative a copy of the complaint.[2]  *Id.*

### (4) Rackley's initiation of disciplinary action against Rice

The exchanges between Rackley and Rice came to a head when on November 1, 2007,

Rackley wrote a letter to Rice notifying Rice of Rackley's intent to begin the disciplinary process

for Rice's alleged violations of the Dallas County Rules of Conduct related to the Jennings

investigation.  *Id.* at AGO000579–81.  The letter lists ten violations that Rackley claims are

supported by "substantial evidence," including:

> "4. You violated a direct order and confronted witness Bridgett Maddux regarding statements she made to the Highway Patrol in the course of the Jennings investigation. . .
>
> 5. You have been insubordinate to me in speech, attitude and actions in the course of the Jennings investigation by objecting to my decision to include the Highway Patrol in the investigation; contacting witness Maddux in direct violation of my orders; by failing to be cooperative and be honest with Highway Patrol investigators . . .
>
> 9. You have been insubordinate and acted in a manner to damage morale within the department, risked damage to department relations with the Highway Patrol, and undermine public confidence in the department by proclaiming that no matter what the Highway Patrol concluded in its investigation of the Jennings incident, you would testify that Lisa Jennings committed suicide . . .

---

[2] Rackley asserts that Maddux's statements regarding the Representative's meeting with Rackley contain hearsay and therefore cannot be considered to support Jennings' motion for summary judgment.  On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56.  However, "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form."  *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (emphasis in original).  Though Rackley claims Wilson's statements could not be offered in admissible form at trial, he does not explain why, for example, Wilson could not be called to testify at trial. Further, Maddux made these statements in a deposition submitted to the Court by Rackley.  *See* Doc. 151-13; *Walker v. Wayne Cty.*, 850 F.2d 433, 435 (8th Cir. 1988) ("[A]lthough the DCI report contained inadmissible double hearsay, the report was submitted by the defendants without reservation of any part. Consequently, the defendants cannot complain because the district court considered the contents of that report.")  Therefore, the Court will consider Maddux's statements for the purpose of summary judgment.

*Id.* On November 2, 2007, Rice wrote a letter to Rackley responding to each of the ten bases for

discipline. *Id*. at AGO000585–87. Rice reiterated his beliefs that the investigation into him

based on the rumored affair was unjust and that Rackley's true motivation was to eliminate a

political opponent. *Id*. Rice responded to Rackley's points 4, 5, and 9 by stating:

> "Issue #4 Violation of a Direct Order
> I am uncertain how you can claim that I violate a direct order by confronting Brigitte
> Maddux. Both myself and Brigitte Maddux have told you that I did not confront her. Mrs.
> Maddux contacted me after gaining my cell phone number from my son. Mrs. Maddux
> has made it perfectly clear in statements to you, Representative Wilson, Dan Nash, and
> many others that this issue has been grossly misrepresented.
>
> Issue #5 Insubordination
> If it appeared that I was being insubordinate in my speech, attitude, and actions, that was
> not my intention. My objection was not in opposition of the Highway Patrol investigating
> the Jennings case, but for you to allow an investigation over an anonymous letter based
> on a rumor . . . you mention that I have not cooperated with the Patrol. This is inaccurate.
> I have fully cooperated each and every time that I have been in contact with them . . .
>
> Issue #9 Damaging Morale
> I have NEVER made any proclamation that I would only testify that Lisa Jennings
> committed suicide. I told you that based on facts from the initial investigation and my
> report, I would have to testify that I believed it to be suicide. Myself, you, the Medical
> Examiner, the Coroner, and the Prosecutor all believed it to be suicide. At no point during
> your investigation did you share additional evidence with me that would suggest anything
> other than suicide. Therefore, I did not have knowledge that would justify changing my
> testimony . . .

*Id*. Rice rejected Rackley's offer for a disciplinary hearing on the matter and notified Rackley

that he would be transferring to another division within Dallas County. *Id*. In another letter

from Rice to Rackley on November 3, 2007, Rice reiterated that his belief that the investigation

into him was politically motivated. *Id*. at AGO000588. There was no further investigation into

or disciplinary action taken against Rice. These documents were filed in Rice's personnel file

and were not disclosed to Jennings prior to his criminal trial.

### (5) "Missing the blood evidence" Memorandum

In Rackley's memorandum documenting a conversation with Rice on October 10, 2007, Rackley stated that "Scott told me that he felt he had let down his friend referring to Lisa Jennings case by missing the blood evidence at that crime scene. I explained to Scott that he was not the only officer there and we all missed the blood evidence at the scene." Doc. 152-1, AGO000569–70. This memorandum was filed in Scott Rice's personnel file and was not disclosed to Jennings prior to his criminal trial.

### f. Defendant George Knowles

During the Jennings investigation, Nash was a Sergeant with the MSHP Criminal Investigation Unit and was stationed at Troop D, the MSHP division covering the eighteen counties in the southwest Missouri. Doc. 151-8, p. 301. Nash had been an officer in the Criminal Investigation Unit since 2003, when he transferred from the Narcotics Unit. *Id*. at 300. During the initial months of the Jennings investigation, Nash's direct supervisor at MSHP was Defendant George Knowles until Knowles was promoted to lieutenant and transferred to Jefferson City on October 1, 2007. Doc. 160-6 (Knowles 2019 deposition), p. 9.

During the Jennings investigation, Nash contends that Knowles read all the reports, attended "probably half" of the investigation team's meetings, and was aware that Nash had submitted Jennings' robe to the forensic lab because Nash forwarded his lab analysis request to Knowles after submitting it. Doc. 151-6, pp. 101–02; Doc. 151-8, pp. 310, 340. Knowles denies reading all of Nash's reports, but acknowledges that he was present for some of the investigation team's conversations and that he was aware Jennings' clothes were submitted for some forensic testing, though he does not know what lab tests he requested. Doc. 160-6, pp. 95–96, 116, 120.

At the time, Knowles did not follow up with investigators to ensure they received the results of any lab testing.  *Id*. at p. 84–85, 96.

Knowles admits that Nash had an "abrasive" personality.  Doc. 160-6, p. 53.  Throughout Knowles' time as Nash's supervisor, other law enforcement officers expressed concerns about Nash's demeanor.  The Sheriff of a nearby county contacted Knowles about Nash's attitude, because Nash had his feet on the desk during a major homicide investigation.  Doc. 160-6, p. 55. Another Sheriff expressed to Knowles that he did not like Nash, though that Sheriff never expressed a reason.  *Id*. at 57.  A third Sheriff contacted Knowles after Nash investigated an officer-involved shooting, because according to Knowles the Sheriff "didn't think that all the evidence on the civil case was gathered that should have been gathered."  *Id*. at 56.  When Knowles asked the Sheriff if he would like to file a complaint, the Sheriff declined.  *Id*.

[REDACTED]

Knowles did, however, discuss Nash with Cooper on occasion, including issues Knowles had with Nash. Doc. 158-28 (2019 investigator conversation with Mike Cooper). Cooper said he "had to poke [Knowles] occasionally and say, 'Hey, he's your guy now. Not mine.'" *Id*. at 11. Knowles contends these discussions were about Nash's abrasive personality. Doc. 160-6, p. 53.

## III.    SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are

insufficient to withstand a motion for summary judgment." *Id*. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.   DISCUSSION

Rackley and Knowles assert that they are entitled to summary judgment on Jennings' Counts I, III, and IV on the basis of qualified immunity. Nash does not raise the defense of qualified immunity, but rather argues that no material dispute of fact exists, and that he is entitled to judgment as a matter of law as to Counts I-III, VI, and VII. Rackley and Dallas County assert they cannot be subject to *Monell* liability under Count V because Jennings cannot show the existence of an unconstitutional policy.

"Qualified immunity shields government officials from [personal] liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). "Evaluating a claim of qualified immunity requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Winslow v. Smith*, 696 F.3d 716, 730–31 (8th Cir. 2012) (internal quotations omitted). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "The 'clearly established' standard . . . requires that the legal principle . . . be so well defined that it is 'clear to

a reasonable officer that his conduct was unlawful in the situation he confronted." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 581, 199 L. Ed. 2d 453 (2018) (citations omitted).

      **a. COUNT I – Procedural Due Process claim against Defendants Nash and Rackley for suppression of evidence**[3]

      Jennings asserts that both Nash and Rackley suppressed various pieces of evidence that would have been material to his guilt or punishment in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). This evidence includes (1) the negative GSR lab results on Jennings' robe; (2) Lisa Jennings' prior suicide attempt, as well as her high level of intoxication at death; (3) materials or information showing one of Nash's reports documenting a conversation with Bridgette Maddux was false; (4) materials documenting the investigation into Scott Rice (5) a memorandum wherein Rackley states "we all missed the blood evidence at the scene"; and (6) evidence from the Jennings' computer hard drives and thumb drive. Rackley argues that he is entitled to qualified immunity on these claims, because Jennings has not provided sufficient evidence that these officers violated a clearly established constitutional right.

      The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83 (1963) that due process requires "the government to disclose to the accused favorable evidence that is material to guilt or

---

[3] Jennings claims that Nash has failed to comply with Federal Rule of Civil Procedure 56(c) and Local Rule 56.1, which set forth pleading requirements for summary judgment motions. Jennings argues that Nash has "not properly set forth any facts which would support his contention that the *Brady* violations were not intentional." Doc. 160 (Plaintiff's suggestions in opposition to Nash's motion for summary judgment), p. 27. However, "[i]t is well-established that when a movant for summary judgment points out to the court an absence of evidence to support an essential element for which the nonmovant will have the burden of proof at trial, the nonmovant must make a sufficient showing that there is a genuine issue of fact as to that element." *Barnwell v. Watson*, 880 F.3d 998, 1005 (8th Cir. 2018). Nash points to an absence of evidence to support Jennings' claim that the failure to disclose the GSR evidence on the robe was intentional. Therefore Jennings, as the nonmovant with the burden of proof at trial, must make a sufficient showing that there is a genuine issue of fact as to this element. Nash has met his burden under Federal Rule 56(c) and Local Rule 56.1.

punishment." *United States v. Dones-Vargas*, 936 F.3d 720, 722 (8th Cir. 2019) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)). In order to recover § 1983 damages against a law enforcement officer for a *Brady* violation, a plaintiff must show that in failing to disclose the evidence, the officer in bad faith "intended to deprive the defendant of a fair trial." *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004). Favorable evidence includes both exculpatory and impeachment evidence, and such evidence rises to the level of being material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *U.S. v. Bagley*, 473 U.S. 667, 682 (1985). A reasonable probability of a different result is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotations omitted).

### (1) Gunshot Residue Evidence on Jennings' Robe

Jennings claims that Nash deliberately concealed the negative GSR results. While Nash concedes that the GSR results were not disclosed to Jennings at trial, he contends that Jennings has not presented sufficient evidence that Nash intentionally withheld the results in an effort to deprive Jennings of a fair trial.

In Jennings' post-conviction proceedings, the Circuit Court of Texas County found that the prosecutor's failure to disclose the negative GSR results on the robe was a *Brady* violation, as it was exculpatory, impeaching, and material. Doc. 154-10. This Court agrees. The prosecution's theory at trial was that the lack of GSR detected on Jennings' hands could be explained by Jennings' having washed his hands, but the blood stains on the robe indicated he nonetheless was present when the gun was fired. *Id*. at pp. 6–8. Therefore, "the absence of gunshot residue on Mr. Jennings' robe would not only have substantially corroborated the

21

inference of his innocence from the negative gunshot residue results on his hands, but also would have supported a conclusion of suicide. The undisclosed gunshot residue report would have significantly undermined the strength of the State's argument that no gunshot residue was found on Mr. Jennings' hands because he might have showered." *Id*. at pp. 6–7. The presence of blood stains on the robe indicated the robe had not been washed, making the lack of GSR on the robe significant in supporting the inference that Jennings was not present for the shooting and that the blood stains were from holding Lisa upon finding her body. The significance of this GSR evidence is such that it "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434. Thus, the GSR evidence was both exculpatory and material. The only remaining issue is whether there is sufficient evidence from which a jury could find that Nash withheld the evidence with an intent to deprive Jennings of a fair trial.

Viewing all facts and drawing all reasonable inferences in the light most favorable to Jennings, there is sufficient evidence to create a genuine dispute of fact as to whether Nash acted with an intent to deprive Jennings of a fair trial in failing to disclose the GSR evidence. Nash admits he requested both a blood analysis and a GSR analysis on Jennings' robe, Doc. 151-8, p. 340, and the lab records reflect he confirmed by phone the GSR test request, Doc. 158-16, p. 2. Jennings has also presented evidence that the lab mailed the GSR results by U.S. mail to Troop D headquarters, Doc. 158-19, pp. 5–6, that upon Nash's request a copy of the results was faxed to the Troop D headquarters fax number, Doc. 158-15; Doc. 158-14; Doc. 158-16, p. 1; Doc. 158-19, pp. 1–3, and that an MSHP laboratory technician called Nash to inform him the results were faxed and conveyed the results to Nash over the phone, Doc. 158-17; Doc. 158-19; Doc. 158-20. An internal MSHP investigation revealed Nash was on duty on July 17, 2007, the day these results were faxed and the phone call was made. Doc. 160-9 (MSHP Professional

Standards Division Investigative Summary), p. 5. Viewed together, a reasonable jury could conclude this evidence suggests that Nash did receive, in one form or another, the negative GSR results yet failed to disclose them to the prosecution or the defense.

This is especially so given his aggressive investigation of the case. Nash on multiple occasions requested that the GSR tests be performed and requested that all laboratory results be faxed to Troop D, yet according to him, he never followed up with the laboratory upon not receiving the GSR results. In ruling on Jennings' post-conviction relief petition, the Circuit Court remarked that "Sgt. Nash was **the** key witness at the trial of this case and this Court is unable to explain how Sgt. Nash did not mention to [the prosecutor] that, in addition to blood and DNA testing, the robe was submitted for gunshot residue." Doc 154-10, p. 18 (emphasis in original).

Based on this evidence, a reasonable jury could find that Nash knew of the results of the GSR test, yet intentionally withheld the results in order to bolster the State's case against Jennings and deprive Jennings of a fair trial.

With respect to Rackley, however, Jennings has presented insufficient evidence for a jury to conclude that Rackley suppressed the GSR results. Jennings argues the evidence showing that Rackley knew of and intentionally suppressed this exculpatory evidence includes that he was present for investigative meetings, that he was entitled to access lab results from the MSHP crime lab, that he expected Nash to share any lab results with him, that he and Nash discussed sending the black robe to the MSHP crime lab, and that before trial Rackley received an investigative file from MSHP, which included "some" lab results. These facts are insufficient to permit the inference that Rackley was aware that the robe was submitted for GSR tests, knew that the results of the tests came back negative, and deliberately withheld those results. That

Rackley was a part of the investigative team and could have made a specific request to see GSR results if he had known such a test had been performed does not provide a reasonable basis to find Rackley "engaged in a conscious effort to suppress exculpatory evidence." *Villasana*, 368 F.3d at 980. *See also Guy v. Parkman*, No. 2:10-CV-00066-SWW, 2011 WL 3046318, at *4 (E.D. Ark. June 10, 2011), report and recommendation adopted, No. 2:10-CV-00066-SWW, 2011 WL 3040151 (E.D. Ark. July 25, 2011) (finding that where undisclosed DNA results had been requested by and returned to one county's sheriff's department, there was no evidence establishing that an investigating officer from another county's sheriff's department who participated in investigation yet testified he had never seen the results made a conscious effort to withhold exculpatory evidence). Therefore, Rackley is entitled to qualified immunity, because there is insufficient evidence to show he violated Jennings' constitutional rights by intentionally withholding exculpatory evidence. His motion for summary judgment on Count I as it pertains to the negative GSR results is granted. Nash's motion for summary judgment is denied, because there is sufficient evidence that Nash withheld the exculpatory evidence in an effort to deprive Jennings of a fair trial.

### (2) Police report omitting evidence about Lisa Jennings' personal and family history of suicide and intoxication at death

Jennings also claims that Nash and Rackley deliberately withheld information about Lisa Jennings' prior suicide attempts, her family history of suicide, and her significant alcohol intoxication at the time of her death when they omitted this information from Nash's police report. Doc. 92, ¶ 51. Nash and Rackley argue that this information was already known to or otherwise available to Jennings.

"When information is readily available to the defendant, it is not *Brady* material, and the prosecution does not violate *Brady* by not discovering and disclosing the information." *U.S. v.*

*Jones*, 34 F.3d 596, 600 (8th Cir. 1994). The information about Lisa Jennings' history and her intoxication at death was readily available to Jennings. Jennings' criminal trial attorney Darrell Deputy stated he had knowledge prior to trial of Lisa's past suicide attempt and witnesses who could attest to this fact. Doc. 151-11 (Jennings 2011 habeas proceedings transcript), p. 119. Further, the documents disclosed to Jennings prior to his criminal trial include an interview with Dale Potter who stated "[Lisa's] mother has tried three times to kill herself . . ." Doc. 158-3, AGO0000232. As to Lisa's intoxication at death, the autopsy report containing this information was provided to Jennings and her intoxication was discussed by the forensic pathologist at trial. Doc. 158-3, AGO0000289–96; Doc. 151-7, pp. 354–55. Therefore, this information was already available to Jennings prior to trial, and it is not *Brady* material. *See Helmig v. Fowler*, 828 F.3d 755, 761 (8th Cir. 2016) (finding no *Brady* violation where defendant's attorney was aware, pre-trial, of the alleged *Brady* material evidence); *United States v. Kime*, 99 F.3d 870, 882 (8th Cir. 1996) (finding where exculpatory information was disclosed on cross-examination of a witness during trial, this was not a *Brady* violation because "*Brady* does not require pretrial disclosure as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence. Due process is satisfied."). Because there is no genuine dispute as to these material facts, Nash's and Rackley's motions for summary judgment on Count I as they pertain to Lisa's personal and family history of suicide and intoxication at death are granted.

### (3)   False Statements Attributed to Bridgette Maddux

Maddux, the schoolteacher of Brad and Lisa's son, was interviewed on May 3, 2007, by Nash and MSHP Officer Crain during the homicide investigation. The statements Nash claimed she made during the interview, including that Rice and Lisa Jennings were having an affair and that Lisa was planning on leaving Brad, were not used during trial, and Maddux was not called

as a witness. Upon seeing this interview report for the first time in 2017, Maddux denies having made the statements regarding Brad and Lisa's marriage and having raised the affair rumor, although she admits that she confirmed having heard the rumor when Nash raised it. Nash's May 3, 2007, interview report—the first allegedly false document—was disclosed to Jennings prior to his criminal trial, and there is no evidence from this period indicating that Rackley or Nash was aware that Maddux contested its contents. Therefore, because there was no evidence suppressed in an effort to deprive Jennings of a fair trial, the May 3, 2007, interview report cannot form the basis for a *Brady* violation.

However, the second allegedly false document— Nash's October 17, 2007, interoffice communication wherein he states Maddux complained that Rice confronted her—as well as the documents indicating Rackley was aware that Maddux contested any alleged confrontation, were not disclosed until October 23, 2017, two weeks prior to Jennings' habeas corpus proceedings. Maddux has continually maintained that she never complained to Nash that Rice confronted her, that in fact Rackley repeatedly contacted Maddux to try to "convince" her that Rice was harassing her, and that she relayed her disavowal of any confrontation multiple times to Nash and Rackley, including requesting her that state representative obtain a copy of the complaint being attributed to her and having her husband contact the local prosecutor to demand that Rackley to stop "harassing" her. Doc. 151-13, pp. 24–27; Doc. 151-8, pp. 175–193; Doc. 152-1, AGO000576, AGO000614.

Jennings claims that both Nash and Rackley suppressed evidence regarding this false interoffice communication that "could have formed the basis for a successful attack on the credibility of Nash and Rackley and the credibility and integrity of their investigative methods." Doc. 158 (Plaintiff's suggestions in opposition to Dallas County and Rackley's motion for

summary judgment), pp. 24–25.  Jennings argues that "Maddux could have testified that these were false statements by Nash" and as to "Nash and Rackley's dishonest misconduct and preparing false reports."  *Id*. at 27.

Nash claims these materials do not constitute *Brady* material, because the information is neither exculpatory nor impeachment evidence of an adverse witness.  Rather, "[a]t best it would be impeachment evidence of a favorable witness," because the substance of the Maddux conversation includes negative statements about Rice.  Doc. 158, p. 24.  But Jennings does not assert that the materials would have been effective in impeaching Rice; rather, Jennings argues the evidence would have been impeaching of Rackley and Nash, who both *did* testify at trial for the prosecution.

Under *Brady*, "[i]mpeachment evidence is evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Conroy*, 424 F.3d 833, 837 (8th Cir. 2005) (quoting *Bagley*, 473 U.S. at 676). "Determining whether a failure to disclose impeachment evidence is 'material' requires consideration of the record as a whole. The relative strengths of the prosecution's case and the impeachment value of the undisclosed evidence bear on whether disclosure in time for use at trial would have made a difference." *United States v. Dones-Varg*as, 936 F.3d 720, 722 (8th Cir. 2019).  *See also Evenstad v. Carlson*, 470 F.3d 777, 784 (8th Cir. 2006) ("In determining the materiality of impeachment evidence, this court considers both the strength of the evidence at issue and the importance of the witness in establishing the defendant's guilt.").

As an initial matter, there is a question as to whether the interoffice memo and evidence that Maddux contested its contents would have been admissible at Jennings' criminal trial as

impeachment material.[4]  However, even assuming the evidence could be admitted, it is of

minimal impeachment value.

As to Rackley, at trial he almost exclusively testified to Dallas County's processing of the

scene and initial determination that the cause of death was suicide, conclusions that Jennings

undoubtedly sought to bolster at his trial.  *See* Doc. 151-7, pp. 380–444.  He did not testify as to

the conclusions of the MSHP/Dallas County homicide investigation.  Therefore, the

impeachment value of the Maddux statements as to Rackley is negligible.  *See Evenstad*, 470

F.3d at 784 (finding that where an officer's "role [at trial] was secondary" and the defendant's

"conviction was not based solely on [the officer's] testimony," impeachment value of evidence

that the officer's alleged improper prompting of a witness during an identification was weak with

only a "limited" impact on the result).

Nash, however, did play a larger role in the trial.  His testimony regarding the bloodstain

pattern evidence at the crime scene, on Lisa Jennings' hand, and on Brad's robe were critical to

---

[4] Under Missouri law, "[i]mpeachment provides a tool to test a witness's perception, credibility, and truthfulness." *Mitchell v. Kardesch*, 313 S.W.3d 667, 675 (Mo. banc 2010).  This includes the potential for cross-examination and extrinsic evidence related to the witness' perception, memory, bias, inconsistent statements, or character for truthfulness and veracity.  *Id*.  However, "a witness may not be impeached by evidence that his or her general moral character is bad or that his or her general reputation for morality is bad."  *Id*. at 677.  The most likely category the allegedly false statements would fit into would be impeachment of a witness' character for truthfulness and veracity, and Missouri law does permit witnesses to "be asked about specific instances of his or her own conduct that speak to his or her own character for truth or veracity, even where the issue inquired about is not material to the substantive issues in the case."  *Id*. However, extrinsic evidence related to those specific acts generally is not permitted where the "extrinsic evidence is 'collateral' to the substantive issues at trial."  *Id*. at 680.  Both forms of impeachment are subject to the trial court's balancing of the probative value of the impeachment questioning or extrinsic evidence against the potential for prejudice.  Here, while the false statement was tangentially related to the Jennings investigation, it is collateral to the substance presented at the criminal trial as well as Nash's and Rackley's testimony, and therefore the Court cannot say whether Jennings would have been permitted by the criminal trial court to impeach Nash or Rackley on these grounds.

the prosecution's case. Further, the overall evidence presented against Jennings was less than overwhelming. However, the extent to which evidence that Nash had reported that Maddux had made a complaint about an officer which Maddux later refuted would have impacted a jury's consideration of Nash's bloodstain pattern analysis such that it would have created a reasonable probability of a different outcome is doubtful.

The Eighth Circuit's opinion in *United States v. Conroy*, 424 F.3d 833, 837 (8th Cir. 2005) is instructive. In *Conroy*, a defendant was indicted on sexual abuse charges, and one of the victims stated to police that she had not immediately reported the rapes because the defendant's father was a police officer. *Conroy*, 424 F.3d at 836. At trial, the victim testified further that the defendant had bragged to her that he had previously been stopped by the police, but when the police discovered who his father was, they set him free. *Id*. The victim had previously informed the government about this incident, but the statement was not disclosed to Defendant. *Id*. On appeal, the defendant argued that failure to disclose the statement about receiving favorable treatment at the traffic stop constituted impeachment material, because he could have used the facts surrounding the stop to impeach the victim's credibility. *Id*. at 837. The Eighth Circuit found that given the tangential nature of the issue, "even if the statement was impeachment evidence, it was not material." *Id*. The issue at trial was the victim's general reason for not immediately reporting the rapes, not the true facts surrounding the traffic stop. *Id*. The Eighth Circuit explained that:

> had the statement been disclosed, it might have affected the trial's outcome only indirectly if (1) the traffic stop did not occur as [the victim] testified, (2) if [the defendant] somehow presented evidence contradicting [the victim's] account of the traffic stop, (3) if the jury believed [the defendant's] evidence regarding the stop over [the victim's] testimony, (4) if this inconsistency affected the jury's credibility determination of [the victim] on the sexual abuse charge, and (5) if the jury based a not guilty verdict on [the victim's] diminished credibility. These many "if's" do not create a reasonable probability of a different outcome.

*Id*. at 837–38.

Similarly here, even if the evidence indicating Nash had created a false witness statement had been disclosed, the outcome could only have been affected (1) if the criminal trial court had permitted Jennings' trial counsel to cross examine Nash about the contested statement, and in light of Nash's denials, had permitted Jennings to present extrinsic evidence on the collateral matter, (2) if the jury then believed that Nash had created a false report detailing Maddux's complaint against Rice; (3) if the jury inferred that Nash's creating a false witness statement unrelated to the substance of the issues presented at trial indicated that his bloodstain pattern analysis was false; and (4) if the jury based a not guilty verdict on Nash's diminished credibility. As in *Conroy*, "[t]hese many 'ifs' do not create a reasonable probability of a different outcome." *Id*. at 838. *See also Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 793 (8th Cir. 2013) (finding that where officers had failed to disclose a witness's statement that just before a shooting the witness had seen an individual who was not the suspect, "[t]o conclude that [the officers] purposefully withheld [the witness's] statement that the man he saw was not [the criminal defendant] would require us to draw inference upon inference in order to conclude there might be a material fact issue lurking somewhere. We decline to do so." (internal quotation and alteration omitted)).

Where courts have found impeachment evidence to be material under *Brady*, the evidence more directly impugned the substance of or motivation behind the witness' testimony or the evidence presented at trial. For example, in *United States v. O'Connor*, three members of a conspiracy testified at the criminal trials of their co-conspirators. *United States v. O'Conner*, 64 F.3d 355, 359 (8th Cir. 1995). Leading up to and during the trial, two of the co-conspirator witnesses had threatened a third co-conspirator witness in an attempt to prevent him from

disclosing certain facts and during trial had instructed the third witness on what to say. *Id*. at

357. Others involved with the conspiracy indicated that those three co-conspirator witnesses

were "getting their stories straight." *Id*. at 358. The government was aware of these attempts to

influence testimony of testifying witnesses but did not disclose this to the defendants. *Id*. The

Eighth Circuit found that this impeachment evidence "could have tipped the balance and caused

the jury to disbelieve [the three witnesses], who provided the only evidence against [the

defendant]." Here, evidence that Nash reported a witness complaint that was subsequently

repudiated but was unrelated to the substance at trial, by a witness who did not testify at trial,

falls far short of the impeachment evidence in *O'Connor*. *See also Reutter v. Solem*, 888 F.2d

578, 581 (8th Cir. 1989) (evidence that a principal witness who directly implicated the criminal

defendant in the crime had been scheduled to appear before the parole board just days after

giving his testimony and a criminal prosecutor in defendant's trial was on the parole board was

material impeachment evidence); *cf. Jones v. Slay*, 61 F. Supp. 3d 806, 828 (E.D. Mo. 2014)

(finding where there was a failure to disclose two unsustained internal affairs complaints against

a testifying officer, this was not material evidence that could have impeached the officer's

credibility, because "[a]ssuming the existence of a duty to disclose evidence of corruption, the

Court concludes such a duty would not extend to unsustained complaints.")

Therefore, the Court finds the interoffice communication and the evidence indicating its

falsity is not material impeachment evidence such that its failure to be disclosed "undermines

confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434. Both Rackley's and Nash's

motions for summary judgment as to this evidence are granted.[5]

---

[5] Although the Court finds that this and other evidence is insufficient to support a finding of a
due process violation, the Court takes no position as to the admissibility of this evidence at trial
for some other purpose.

### (4)  Scott Rice Personnel Evidence

Related to the Bridgette Maddux evidence is the series of documents from Rice's personnel file that were only disclosed to Jennings on October 23, 2017, two weeks prior to his habeas corpus proceedings.  The undisclosed evidence documents Rackley's prompting of an investigation into and initiation of discipline against Scott Rice, stemming in part from Nash's allegedly false Maddux reports.  Jennings argues that this investigation and the subsequent discipline of Rice was Nash and Rackley's attempt to discredit Rice as a potential defense witness, because Rice disagreed with joint investigation's determination that it was a homicide.  Jennings claims that the personnel documents were "highly impeaching of Rackley, Nash and the integrity of their investigation."  Doc. 158, p. 22.

As an initial matter, Nash and Rackley again misconstrue Jennings' argument with respect to the Rice materials.  The suppression Jennings' claim relies on is not the suppression of Rice or his testimony regarding Lisa's death, but rather the suppression of "evidence, which would have proved Rackley and Nash's improper attempts to dissuade Rice from testifying, persuade him to change his testimony and/or nullify his potential effectiveness as a defense witness."  Doc. 158, p. 26.

The Rice documents almost entirely pertain to Rackley and Rice, and do not mention Nash.  Therefore, to the extent that Jennings claims the Rice personnel documents could have impeached Nash's trial testimony, this argument is rejected.  The impeachment value of these documents as to Nash is only implicated insofar as it relates to the allegedly false October 17, 2007 Maddux interoffice communication, which the Court addressed above.  Further, as discussed, at trial Rackley almost exclusively testified to Dallas County's processing of the scene and initial determination that the cause of death was suicide, conclusions that Jennings would

have sought to bolster.  Therefore, the Rice documents present negligible impeachment value with respect to Rackley's trial testimony.  *See Evenstad*, 470 F.3d at 784 (finding that where an officer's "role [at trial] was secondary" and the defendant's "conviction was not based solely on [the officer's] testimony," impeachment value of evidence that the officer's alleged improper prompting of a witness during an identification was weak with only a "limited" impact on the result).

Jennings' primary argument is that the Rice documents were material as they could have provided a basis to attack "the credibility and integrity of [Nash and Rackley's] investigative methods," citing *Kyles v. Whitley*, 514 U.S. 419 (1995) and *Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985).  In *Kyles*, an informant who led the police to suspect the Defendant in a homicide, and who the prosecution admitted was "essential to its investigation" and "made the case" against the Defendant, had also provided inconsistent statements about the circumstances of the murder and self-incriminating assertions regarding his interest in seeing the Defendant convicted. *Kyles*, 514 U.S. at 445.  The statements were never produced to the defense, and the witness was not called at trial.  *Id*. at 428–29.  The Supreme Court reasoned that the police's willingness to uncritically accept the witness's obviously contradictory and suspicious statements implicating the Defendant presented evidence with which the defense could have "examined the police to good effect on their knowledge of [the informant's] statements and so have attacked the reliability of the investigation in failing even to consider [the informant's] possible guilt in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted."  *Id*. at 446.  The Supreme Court concluded that "[b]y demonstrating the detectives' knowledge of [the informant's] affirmatively self-incriminating statements and failure to treat him as a suspect, the defense could have laid the foundation for a vigorous argument that the

police had been guilty of negligence" and would have "throw[n] the reliability of the investigation into doubt." *Id*. at 447. This, in conjunction with evidence impeaching eye witnesses, was sufficient to undermine confidence in the verdict. *Id*. at 454.

Similarly, in *Lindsey*, the Fifth Circuit found that a withheld statement by one of two identifying eyewitnesses who originally stated to officers that he had never seen the assailants yet at trial testified that he had seen the assailant's face was *Brady* material. *Lindsey*, 769 F.2d at 1042. The Fifth Circuit found it "carried within it the potential both for the destruction of [the witness's] identification of [the suspect] and the discrediting, in some degree, of the police methods employed in assembling the case against him." *Id*. at 1043.

The facts here are distinguishable. In *Kyles* and *Lindsey*, the questionable investigatory methods were directly related to the evidence that led to the conviction. In *Kyles*, the officers' uncritical acceptance of a key informant's inconsistent and incriminating statements related to the homicide were exculpatory because that key informant had been the driving force behind locating the suspect. In *Lindsey*, the police methods questioned were those that led police officers to ignore one of two key eyewitnesses' inconsistent statements. In both *Kyles* and *Lindsey* the evidence presented as evidence of guilt was closely tied to an investigatory method or choice made by officers such that the unsoundness of those particular methods directly implicated the evidence presented at trial. *See also Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) (concluding that "[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation" and finding that withheld evidence strongly implicating another suspect who was eliminated as a suspect based on a hearsay statement that police did not substantiate or corroborate, and who the police knew had ample motive to kill the victim

"rais[ed] serious questions about the manner, quality, and thoroughness of the investigation that led to [the plaintiff's] arrest and trial" and constituted *Brady* material).

Here, there is insufficient evidence from which a jury could reasonably draw such a connection between the investigation into and discipline of Rice and the investigatory methods used in compiling the case against Jennings. The Rice documents, even when viewed in the light most favorable to Jennings, demonstrate that Rackley used a pre-existing affair rumor to aggressively pursue an investigation into Rice's involvement with Lisa Jennings. Rackley then threatened discipline against Rice based on both Rice's alleged resistance to the investigation as well as the Maddux complaint, which he knew to be inaccurate. However, while Rackley may have pursued discipline against Rice based on minimal, contested evidence and his contention that Rice was being insubordinate by refusing to agree with the determination of the homicide investigation, Jennings has not presented sufficient evidence to connect this to the substance of the actual criminal investigation such that it would "rais[e] serious questions about the manner, quality, and thoroughness of the investigation that led to [the plaintiff's] arrest and trial." *Bowen,* 799 F.2d at 613. Rice himself repeatedly reiterated his belief that Rackley's actions were motivated by Rice's projected campaign for Dallas County Sheriff. The connection between the evidence that Jennings claims would discredit the caliber of the homicide investigation itself is too tangential, and therefore the Court cannot say it is exculpatory or impeachment evidence that "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434. Therefore, as to the Rice documents, Nash's and Rackley's motions for summary judgment are granted.

### (5) Computer Evidence

In his suggestions in opposition to Nash's motion for summary judgment, Jennings for the first time points to evidence that Nash potentially tampered with computer evidence seized

from Lisa Jennings' home. The hard drives were initially seized pursuant to a search warrant requested by Rice, Doc. 158-3, AGO0000287, and they were later turned over by Dallas County Deputy Sean Fields to the MSHP Computer Forensics Unit, Doc. 151-2, AGO0000336. MSHP performed an imaging of the data contained on one of the hard drives, though the second hard drive was unable to be imaged. *Id*. On April 25, 2007, Nash seized two thumb drives from the Jennings' residence, and there is no record of Nash submitting these for forensic examination. Doc. 158-3, AGO0000398; Doc. 158-26, p. 13.

On January 28, 2019, Plaintiff's forensic examiner examined one thumb drive and the two hard drives seized. The examiner's report states that in the period between the MSHP's 2007 analysis and the expert's 2019 analysis, the hard drives were "contaminated" because "thousands of files were found on the MSHP image which were not found on my image. The same is true for my image where thousands of files were found that do not appear in the MSHP image." Doc. 158-27, p. 4. As to the thumb drive file, the expert states there was a motion picture media file that was "modified" one hour and fifteen minutes after Nash seized the evidence from the Jennings' home on April 25, 2007. *Id*. at 4. Jennings does not describe what the modified media file is, or what the remainder of the hard drive contents analyzed by their expert reveal.

It is unclear from Jennings' briefing whether he intends to raise this as a separate due process violation or whether he merely intends to offer it as evidence of Nash's alleged pattern of evidence manipulation. However, Plaintiff has neither alleged nor presented any evidence suggesting that any material on the hard drives or thumb drive was exculpatory. *See United States v. Rouse*, 410 F.3d 1005, 1010 (8th Cir. 2005) (holding that defendants could not establish a *Brady* violation when "defendants can only speculate that the [suppressed evidence] might

have contained material exculpatory information"); *Brown v. Chiappetta*, 806 F. Supp. 2d 1108,

1117 (D. Minn. 2011) (rejecting a *Brady* claim in part because there was no evidence that the

undisclosed, unrecorded conversations contained any exculpatory evidence).  Therefore, to the

extent that Jennings intends to assert this as a separate *Brady* violation, Rackley's and Nash's

motions for summary judgment are granted as to the computer evidence.

### (6)   "Missed the blood evidence" Memorandum

In a memorandum written by Rackley documenting the October 10, 2007, meeting

between Rackley and Rice, Rackley writes, "Scott told me that he felt he had let down his friend

referring to Lisa Jennings case by missing the blood evidence at that crime scene. I explained to

Scott that he was not the only officer there and we all missed the blood evidence at the scene."

Doc. 152-1, AGO000569.  Jennings contends that this statement is "highly exculpatory," because

it represents Rackley's acknowledgment that too few photographs of the blood evidence were

taken at the scene.  To support this theory, Jennings contends bloodstain pattern expert Joseph

Slemko testified at the 2017 habeas proceedings that there were too few photographs taken at the

scene, which compromised the officers' ability to analyze it after the fact.  Jennings argues that

"[t]here is a reasonable inference from the memo by Rackley and the testimony of Slemko that

Rackley was referring to blood stains that should have been photographed that weren't."  Doc.

158, pp. 23–24.

Jennings has not pointed to evidence in the record that the expert Slemko did testify that

there was blood evidence that should have been but was not photographed at the crime scene.[6]

---

[6] Jennings cites to Rackley's Exhibit 8, pages 38, 39, 41, and 42.  Rackley's Exhibit 8 is the
transcript of the 2018 habeas proceedings, and the transcript index indicates Joseph Slemko did
testify.  However, the excerpt of the exhibit provided by Rackley begins with Scott Rice's
testimony on page 140 and does not include Joseph Slemko's testimony.  Slemko's expert report,

However, even if Slemko did testify to this effect, Jennings provides no evidence that Rackley suspected additional photographs should have been taken in order to more fully assess the bloodstain pattern evidence.  Defendants provide evidence explaining the comment by pointing to other instances in which Rackley describes the Dallas County investigation as having "missed" the evidence when it failed to attribute any significance to the lack of blood on Lisa's hand.  *See, e.g.*, Doc. 151-7 (Jennings 2009 criminal trial transcript), pp. 392–93 ("Prosecutor: Other than [the single drop], was there any other blood on her hand? Rackley: None that I observed sir . . . Prosecutor: Did you see any skull particles or brain matter on that hand, at all? Rackley: No. Prosecutor: And did you find that unusual or did that pique your curiosity in terms of your investigation of this case? Rackley: That was the one piece, when the blood was reconstructed that we had missed that kind of started tying things together.")  Further, Jennings' theory is contradicted by his own contention that the photographs were sufficient such that Slemko was able to conclude "that the photographic evidence clearly proved that the gunshot wound was self-inflicted."  Doc. 160 (Plaintiff's suggestions in opposition to Nash's motion for summary judgment), p. 12, ¶ 36.

Beyond speculating at the meaning of this sentence, Jennings has presented no evidence from which a jury could infer that in 2007, Rackley believed there was insufficient photographic documentation of the blood evidence at the scene.  There is ample evidence in the record, including the trajectory of the Jennings investigation overall, to suggest Rackley's statement was in reference to Dallas County's initial determination that Lisa's death was a suicide, followed by MSHP's use of bloodstain pattern evidence to determine it was a homicide.  *See P.H. v. School*

Doc. 158-11, does not include this conclusion.  Therefore the Court is unable to find support in the record for Jennings' assertion.

*Dist. of Kansas City*, 265 F.3d 653 (8th Cir. 2001) (The nonmoving party "is entitled to all reasonable inferences—those that can be drawn from the evidence without resort to speculation."). Jennings' claim that this quote from the Rackley memorandum renders it "highly exculpatory" is rejected, and Nash's and Rackley's motions for summary judgment with respect to this evidence are granted.

### b. COUNT II – Substantive Due Process claim against Defendant Nash for Fabrication of Evidence

Under the Fourteenth Amendment, the guarantee of substantive due process "prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc). This protection "prohibits conduct that is so outrageous that it shocks the conscience or otherwise offends judicial notions of fairness, or is offensive to human dignity." *Id.* (quotations omitted). The Eighth Circuit has found that the fabrication of evidence may be "conscience-shocking" so as to rise to the level of a Fourteenth Amendment violation. *See Winslow*, 696 F.3d at 732 (recognizing a claim that officers "manufactured false evidence" as falling under the Fourteenth Amendment); *Livers v. Schenk*, 700 F.3d 340 (8th Cir. 2012) (same). However, "a manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant." *Winslow*, 696 F.3d at 732 (8th Cir. 2012). Such fabrication of evidence must be "used to deprive the defendant of h[is] liberty in some way." *Id.* at 735; *see also Wilson v. Lawrence Cty.*, 260 F.3d 946, 954 (8th Cir. 2001) ("If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated.")

In his Complaint Jennings alleges that Nash fabricated a series of pieces of evidence: (1) the probable cause statement omitting Lisa Jennings' prior suicide attempt and intoxication at

death; (2) Nash's report documenting the May 3, 2007, interview of Maddux, wherein Nash claimed Maddux raised the rumored affair between Lisa Jennings and Rice, as well as attested to Lisa Jennings' good character and Brad Jennings' abusive behavior, all of which Maddux denies; (3) Nash's October 17, 2007, interoffice communication documenting an August 21, 2007, conversation Nash had with Maddux wherein he claims she reported Rice had confronted her about her statements in the May 2007 interview, which Maddux also denies; and (4) Nash's March 15, 2007, crime scene reconstruction wherein next to the field "Past suicide attempt," Nash indicated it was "Not Consistent with Suicide."

As to document (1), Jennings' Complaint claims that Nash "fabricated a [probable cause] statement in furtherance of his plan to enhance the merits of the prosecution case by omitting references to Lisa Jennings' prior history of suicide attempt and state of intoxication at the time of her death, facts which he was specifically aware of." Doc. 92, ¶ 58. Jennings does not assert that there was fabricated evidence that was detailed in the probable cause statement that formed the basis for his arrest, but rather that the probable cause statement itself was fabricated evidence due to these omissions. These allegations appear to be a recasting of Jennings' procedural due process claim as to the suppression of Lisa's history of suicide and state of intoxication at death, and the Court has already addressed these facts above in Count I. *See Jones*, 61 F. Supp. 3d at 830 ("[P]laintiff attempts to rely on conduct that he alleges violated his procedural due process rights (the alleged suppression of photographs, failure to disclose [an alternative suspect's] arrest, failure to disclose corrupt practices) in arguing that his substantive due process claims should survive summary judgment. The Court will focus on the actions that are alleged to constitute the manufacture of false evidence.").

To the extent that Jennings contends the finding of probable cause was due only to Nash's purposeful omissions from the probable cause statement, this "invokes plaintiff's rights under the Fourth and Fourteenth Amendments rather than Due Process Clause." *Jones*, 61 F. Supp. 3d at 834 (citing *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978); *Livers*, 700 F.3d at 357) (finding that where plaintiff alleged defendant officer submitted a false affidavit in order to obtain a search warrant in the absence of probable cause, this was not a cognizable substantive due process claim). *See also Stewart v. Wagner*, 836 F.3d 978, 983 (8th Cir. 2016) (finding a district court improperly analyzed a plaintiff's claim that government actors "procured [a witness'] fabricated statements to create probable cause when none existed" as a substantive due process issue because "the Supreme Court is reluctant to expand the concept of substantive due process," and "has held that where a particular Amendment provides an explicit textual source of constitutional protections against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing those claims."). Plaintiff has not alleged a Fourth and Fourteenth Amendment false arrest claim under § 1983, but rather alleges a common law false arrest claim, and the Court finds Jennings' allegation is addressed through this claim in Count VI.

With respect to documents (2) and (3), although there appears to be a genuine dispute of fact as to whether Nash fabricated these documents, there is no indication that the fabricated documents were used to convict Jennings. The two documents were not introduced at trial, and neither Maddux nor Rice were called as witnesses. There is also no evidence that the documents influenced other evidence presented at trial. The allegedly false Maddux statements in Nash's May 3, 2007, report describing the Jennings' volatile marriage were not raised and were duplicative of other testimony at trial. *See* Doc. 151-7, pp. 242–43; 446–450; 477–479. There is

also no evidence that the fabricated documents succeeded in dissuading Jennings' criminal trial attorney Darrell Deputy from calling Rice to testify. Deputy testified that prior to trial he spoke to Rice twice, determined Rice did not have any information helpful to the case, and said that he would not have called Rice as a witness at trial even absent the affair rumor. Doc. 151-11, pp. 164–65. *Cf. Ferguson v. Short*, No. 2:14-CV-04062-NKL, 2015 WL 4877539, at *24 (W.D. Mo. Aug. 14, 2015) (finding that even where allegedly fabricated witness statements were not introduced at trial, a question of fact remained as to whether those statements influenced another witness's testimony at trial); *Jones*, 61 F. Supp. 3d at 834 (finding that while a false police report was not shown to the jury, because the prosecutor stated he "reviewed [the] police report, . . . relied on the content of the police report . . ., and would not have prosecuted plaintiff without the police report," there was evidence the false report influenced the trial against plaintiff so as to support a substantive due process claim).

Though creation of false witness statements is concerning activity, without a showing that the allegedly false statements had some causal relationship to Jennings' conviction, the Court cannot say the statements violated Jennings' substantive due process rights. *See Winslow*, 696 F.3d at 735 ("[I]f an officer fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." (internal alterations and quotations omitted)); *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014) (finding a due process claim exists "if there is a reasonable likelihood that, without the use of that [falsified] evidence, the defendant would not have been convicted" and noting that "[w]e use 'reasonable likelihood' to emphasize that plaintiffs bringing fabrication claims must draw a meaningful connection between their conviction and the use of fabricated evidence against them."); *Whitlock v.*

*Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012) (finding falsification of evidence during an investigation can violate due process "so long as a plaintiff can show the fabrication actually injured her in some way"); *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) (finding that even if a prosecutor tortured a witness to obtain statement implicating defendant and put statement "in a drawer, or framed it and hung it on the wall but took no other step, or began prosecuting but did not introduce the statement" no constitutional right of the defendant would be violated).

Finally, in document (4), Nash's March 15, 2007, crime scene reconstruction, Nash indicated that the factor of whether Lisa had a past suicide attempt was "Not Consistent with Suicide." Doc. 154-2. According to Rice, during a meeting with Nash and Rackley, Rice saw this form and informed Nash that his assessment of that factor was inaccurate because approximately twenty years prior Lisa had attempted suicide as a teenager. Doc. 151-8, p. 151. Rackley also believes that Nash knew of the suicide attempt. Doc. 151-5, p. 114. Nash denies having known of any past suicide attempts. Doc. 158-18, pp. 35–36. Nash argues, however, that Jennings has failed to provide evidence that the report is fabricated, because there is no evidence to show that this omission was made intentionally, as the proximity in time to Lisa's death would have made it irrelevant to the investigation, demonstrated by the fact that even Rice did not include Lisa's suicide attempt in his initial Dallas County written report. Jennings does not directly respond to this argument in his suggestions in opposition.

Viewing the facts presented in the light most favorable to Jennings, the Court cannot say a reasonable jury could find that Nash's conduct here rises to the level of behavior that shocks the conscience. The record is clear that Nash completed the crime scene reconstruction prior to Rice's informing him of the prior suicide attempt. Though Nash did not correct the designation

on the form, he also did not use the form as a basis to abandon any suicide inquiry. Rather, Nash and the investigative team continued to ask witnesses whether Lisa appeared depressed or suicidal. *See, e.g.*, Doc 158-3, AGO000227, AGO0000229; Doc. 151-2, AGO0000254, AGO0000261, AGO0000263, AGO0000265, AGO0000267. Even if Nash intentionally refrained from changing his prior designation, there is no evidence that this was done in an effort to "frame" Jennings given Nash's subsequent efforts to determine if Lisa was suicidal or depressed. Further, there is no indication that the crime scene reconstruction report or a theory that Lisa had never attempted suicide previously were presented in support of Jennings' arrest or prosecution. *See Winslow*, 696 F.3d at 735 ("[I]f an officer fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." (internal alterations and quotations omitted)).

The Court cannot say that Nash's failure to change his incorrect conclusion on the crime scene reconstruction rises to the level of conduct that courts have found to be shocking to the conscience so as to be of "the most severe violations of individual rights that result from the brutal and inhumane abuse of official power." *White*, 696 F.3d at 758 (internal quotations omitted) (finding evidence that officers "systematically and intentionally coached witnesses into providing false testimony that fit Defendants' particular narrative of how the crime was committed" could "shock the conscience" so as to support a substantive due process claim). *See also Winslow*, 696 F.3d at 733 ("Defendants may be held liable if they . . . systematically pressured witnesses to manufacture false testimony to fill gaps in an investigation."); *Livers*, 700 F.3d at 355 (evidence that officers planted blood evidence, coerced confessions, and pressured witnesses to implicate defendant was conduct that could support a fabrication of evidence claim);

*Jones*, 61 F. Supp. 3d at 832 (where Plaintiff produced evidence that defendant officer falsely told a federal prosecutor that he saw Plaintiff holding a bag of crack cocaine and the statements directly influenced the trial, this could support the inference that Defendant officers manufactured false evidence in order to convict plaintiff ). Jennings has not cited any authority indicating otherwise. Therefore, as to the crime scene reconstruction report, Nash's motion for summary judgment is granted.

Even when viewing all evidence in the light most favorable to Jennings, no reasonable jury could find that the facts here support a substantive due process claim, and therefore Nash's motion for summary judgment as to Count II is granted.

### c. COUNT III – Conspiracy to Deprive Jennings of his Constitutional Rights against Defendants Nash and Rackley

"To prove a § 1983 conspiracy claim, the plaintiff must show that the defendant (1) conspired with others to deprive him or her of a constitutional right; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured the plaintiff." *Helmig v. Fowler*, 828 F.3d 755, 763 (8th Cir. 2016). "The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *White*, 519 F.3d at 814. "[T]he plaintiff need not show that each participant knew the exact limits of the illegal plan, but the plaintiff must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights. The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." *Id*. at 816. "A commonly held belief is not a conspiracy," nor is a conspiracy shown by the mere fact that

"[v]arious people engaged in investigating and reporting suspected criminal activity." *Meyers v. Morris*, 810 F.2d 1437, 1454 (8th Cir. 1987).

Jennings' Complaint states that Rackley and Nash conspired to both suppress exculpatory and impeaching evidence and to fabricate evidence ensuring Jennings would be charged and convicted.  Doc. 92, ¶ 64.  However, the only underlying deprivation of a constitutional right that the Court has found sufficient evidence to support is Nash's suppression of the exculpatory GSR results.  Beyond the undisputed facts that Rackley participated in the joint homicide investigation and the execution of the search warrant which collected Jennings' robe, there is no evidence that Rackley knew of, let alone conspired to suppress, the exculpatory GSR results.  *See Myers*, 810 F.2d at 1454 ("Various people engaged in investigating and reporting suspected criminal activity does not amount to conspiracy. We look for a genuine factual issue of concerted activity toward an unlawful objective.")  Therefore, because there is insufficient evidence from which a jury could conclude Rackley and Nash conspired to suppress the exculpatory GSR evidence, Rackley and Nash are entitled to summary judgment as to Count III.

### d.  COUNT V - *Monell* liability claim against Defendant Rackley in his official capacity and Defendant Dallas County[7]

A municipality or local government can be sued directly under § 1983 when that local government implements an unconstitutional policy or custom.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).  A municipality may also be held liable for the

---

[7] "[A]s a suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity, a suit against a government official in only his official capacity should be dismissed as redundant if the employing entity is also named." *King v. City of Crestwood*, 899 F.3d 643, 650 (8th Cir. 2018) (quotation omitted).  Because Count V is alleged against both Dallas County and Rackley in his official capacity, Rackley's motion for summary judgment on Count V is granted.

unconstitutional acts of its employees when those acts implement or execute an unconstitutional municipal policy or custom. *Id*. While "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985), "an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). In this scenario, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "In order for municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Cooper v. Martin*, 634 F.3d 477, 481–82 (8th Cir. 2011) (internal quotation and alteration omitted).

Jennings claims that Dallas County is subject to liability both because "[t]here was a deliberately indifferent failure to train or supervise by Dallas County" and through the unconstitutional actions of its final policymaker Rackley. However, because the Court concludes that Rackley did not violate Jennings' constitutional rights, there is no underlying constitutional violation onto which municipal liability could attach, and therefore Dallas County cannot be subject to *Monell* liability. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (finding that the law does not authorize "the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."); *Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). Therefore, Dallas County's motion for summary judgment is granted.

### e. COUNT IV – Failure to supervise claim against Defendant Knowles

Jennings asserts that as Nash's supervisor at MSHP, Knowles failed to adequately supervise Nash because he "knew of or should have known of Nash's common scheme or plan of, inter alia, omitting relevant facts to suit his own purposes." Doc. 162 (Plaintiff's suggestions in opposition to Knowles' motion for summary judgment), p. 9. Knowles asserts he is entitled to qualified immunity, because Jennings has not set forth sufficient evidence to support a finding that Knowles violated Jennings' constitutional rights.

A supervisor cannot be held vicariously liable under § 1983 for an employee's unconstitutional actions. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995). However, a supervisor "may be held liable if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Marsh v. Phelps Cty.*, 902 F.3d 745, 754 (8th Cir. 2018) (internal quotations omitted).

In order to demonstrate the supervisor had notice of a pattern of unconstitutional acts committed by subordinates, a plaintiff must provide "proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). The pattern of conduct "must be very similar to the conduct giving rise to liability." *Livers*, 700 F.3d at 356 (8th Cir. 2012). Knowles will be entitled to qualified immunity "unless

he had notice of a pattern of conduct that was sufficiently egregious in nature." *S.M.*, 808 F.3d at 340.

The record is clear that Knowles was aware of Nash's difficult personality and the interpersonal challenges it posed among collaborating law enforcement offices. Knowles admits that Nash had an abrasive personality and that Knowles received complaints about Nash's attitude. Doc. 160-6, p. 53–57. However none of these complaints related to Nash's investigatory ability, let alone a pattern of evidence suppression or fabrication. ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████. *See Livers*, 700 F.3d at 356 (finding that where an officer is accused of fabricating evidence in a murder investigation, "[n]otice of allegations [that the officer] committed dishonest acts unrelated to handling evidence is not sufficient to support [the Sheriff's] liability for a failure to supervise.").

While Nash's former supervisor Cooper and Knowles on occasion discussed their difficulties with Nash, Cooper's and Knowles' recollection of these conversations indicate that they pertained to Nash's difficult personality as a supervisee, not doubts about the quality of his policework. Rather, ████████████████████ and his subsequent statements, Cooper reiterated that ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ and

"[h]is cases in narcotics were always iron-clad. I didn't have any issues with the cases that he made," Doc. 158-28. The evidence presented is insufficient to permit the inference that Knowles received notice of a pattern of unconstitutional acts. *See Perkins*, 915 F.3d at 524 (holding that while the supervisor was on notice that the officer was "a lazy and careless police officer" who engaged in "unbecoming conduct and used inappropriate language [in violation of] the police department's general orders or rules and regulations," this did not establish a pattern of constitutional violations even if it "[spoke] volumes about [the officer's] general unfitness for police work.").

The only piece of evidence Jennings offers that is somewhat "similar to the conduct giving rise to liability" is the concern expressed by a Taney County Sheriff that after Nash had investigated an officer-involved shooting, "the sheriff didn't think that all the evidence on the civil case was gathered that should have been gathered." Doc. 160-6, p. 56. Though Knowles does not recall what evidence the Taney County Sheriff's concern was referencing, this does indicate that Knowles received notice that Nash's handling of evidence was deficient. *Cf. Livers*, 700 F.3d at 356 ("Notice of allegations [that an officer] committed dishonest acts unrelated to handling evidence is not sufficient to support [the Sheriff's] liability for a failure to supervise" where the officer allegedly fabricated of evidence). However, when Knowles asked the Sheriff if he would like to file a complaint, the Sheriff declined. Though it is a close question, the Court cannot say this single incident creates a basis on which a reasonable jury could find Knowles "had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right" that was sufficiently similar to the alleged suppression of evidence here so as to meet this "rigorous standard." *S.M.*, 808 F.3d at 340; *see also Perkins*, 915 F.3d at 525 (finding that even where a supervisor had notice that an officer "body-slamm[ed] a mentally-ill,

homeless black woman," because the officer claimed the woman struck him first, "the record does not support an inference that [the officer's] use of force was unconstitutional" and therefore the officer was not on notice of a pattern of unconstitutional conduct); *Doe v. Gooden*, 214 F.3d 952 (8th Cir. 2000) (finding where supervisors knew of a teacher's repeated verbal abuse of students and two incidents of physical abuse, this was insufficient to establish notice of a pattern of unconstitutional acts); *Thelma D. v. Board of Education of City of St. Louis*, 934 F.2d 929 (8th Cir. 1991) (five complaints of abuse over sixteen-year period against teacher insufficient to establish pattern of misconduct); *Jacob v. City of Osceola, Mo.*, No. 05-0323-CV-W-NKL, 2006 WL 741918, at *8 (W.D. Mo. Mar. 20, 2006) ("The Eighth Circuit has held that isolated incidents are insufficient to establish supervisory liability for a constitutional violation because they do not provide adequate notice of a pattern of misconduct.")

Further, Plaintiff has not presented sufficient evidence that Knowles acted with deliberate indifference to Jennings' rights. "When the issue is qualified immunity from individual liability for failure to train or supervise, deliberate indifference is a subjective standard that entails a level of culpability equal to the criminal law definition of recklessness." *S.M.*, 808 F.3d at 341 (quoting *B.A.B., Jr. v. Bd. of Educ. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012)). "To be deliberately indifferent, an official must both be aware of facts from which the inference could be drawn that a substantial risk of unconstitutional harm exists, and he must also draw the inference." *S.M.*, 808 F.3d at 341 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Jennings cites *Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012) and *Kahle v. Leonard*, 477 F.3d 544 (8th Cir. 2007) to support his supervisory liability claim. In *Winslow*, the Eighth Circuit reversed a grant of qualified immunity to police defendants where it determined a reasonable jury could conclude the defendants recklessly investigated a murder and

manufactured false evidence in order to complete their investigation. *Winslow*, 696 F.3d at 731. However, the claims in *Winslow* were only against the perpetrating officers; the Plaintiff did not assert a claim for supervisory liability. In *Kahle*, a female inmate was sexually assaulted by a correctional officer, and claimed the officer's supervisor was liable for failure to supervise. *Kahle*, 477 F.3d at 547. The supervising officer conceded "that no one is supposed to go into an inmate's cell after lockdown. Yet he knew that [an officer] with barely a month's experience working at the Jail (and therefore not someone whom [the supervisor] would have any reason to trust), went to a female detainee's cell three times after lockdown within the space of an hour. On at least one of those occasions, [the officer] stayed in her cell for at least five minutes." *Id*. at 552. The Eighth Circuit determined that on those facts, "a reasonable jury could conclude that [the supervisor] was aware of a substantial risk of serious harm to [the inmate] and that he exhibited deliberate indifference to that risk." *Id*.

*Kahle* is distinguishable. The evidence Jennings cites to support his contention that Knowles was deliberately indifferent to Nash's suppression and fabrication here is that Nash claims Knowles reviewed Nash's reports in the Jennings investigation and attended investigatory meetings. Knowles disputes whether he read all of Nash's reports. However, even if Knowles had read Nash's reports, Jennings points to no report that would make Knowles aware that the GSR test had actually been performed, that it had come back negative, or that Nash had suppressed the material. This falls far short of the evidence provided in *Kahle*, where the offending officer personally informed the supervisor that he visited an inmate's cell three times after hours. Jennings also contends Knowles "could have easily uncovered the nefarious scheme perpetrated by Nash and Rackley in falsifying reports about Bridgette Maddux." Doc. 162, p. 13. However, Knowles ceased being Nash's supervisor on October 1, 2007, and the first

documentation that begins to connect the Maddux statements to alleged efforts to discredit Rice

was an October 2007 memorandum, and the record is clear that Rackley placed this

memorandum into Rice's Dallas County personnel file, not the MSHP investigative file. Though

Knowles may have read the initial May 3, 2007, Maddux interview report in the MSHP

investigative file, there is no evidence indicating Knowles knew or could have known of its

falsity.

Even viewing the facts in the light most favorable to Jennings, a reasonable jury could

not determine that Knowles received notice of a pattern of unconstitutional acts and that he was

deliberately indifferent to or authorized those acts. Knowles is therefore entitled to qualified

immunity, and his motion for summary judgment is granted.

### f. COUNT VI – Common law false arrest claim against Defendant Nash

Under Missouri law, "false arrest occurs when there is a confinement without legal

justification." *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 757 (8th Cir. 2001) (citing *Desai v.*

*SSM Health Care*, 865 S.W.2d 833, 836 (Mo. Ct. App. 1993)). Where "an arrest is supported by

probable cause, that arrest is justified per se under Missouri law and therefore cannot form the

basis of a false-arrest claim." *Zike v. Advance Am., Cash Advance Centers of Missouri, Inc.*, 646

F.3d 504, 512 (8th Cir. 2011). "Probable cause exists when the facts and circumstances warrant

a person of reasonable caution to believe that an offense has been or is being committed, based

on the circumstances as they appear to a prudent, cautious and trained police officer." *Walker v.*

*Dir. of Revenue*, 137 S.W.3d 444, 446 (Mo. banc 2004). "Although there must be a fair

probability that a particular offense has been committed, probable cause does not demand any

showing that such a belief be correct or more likely true than false . . . the level of proof

necessary to show probable cause is substantially less than required to prove guilt beyond a

reasonable doubt." *Southards v. Dir. of Revenue*, 321 S.W.3d 458, 462 (Mo. Ct. App. 2010) (internal citations and quotations omitted).

Jennings asserts that probable cause did not exist for his arrest, relying on the Texas County Circuit Court's conclusions discrediting Nash's bloodstain pattern analysis and finding that the remaining evidence presented at trial was "thin." Jennings further asserts that whatever probable cause may have existed was fabricated by Nash.

Jennings is correct that the evidence contained in Nash's probable cause statement submitted to the Dallas County Circuit Court was far from overwhelming. However, "the level of proof necessary to show probable cause is substantially less than required to prove guilt beyond a reasonable doubt." *Southards*, 321 S.W.3d at 462. Nash's statement detailed the scene discovered by Dallas County, including that Lisa Jennings' body was found in Brad Jennings' closet, and that Brad's handgun was found under her left leg. Doc. 154-16. The statement further describes that Jennings advised that he and Lisa had been in an argument that night, and that while Jennings stated Lisa had been depressed for some time, Lisa's daughter contended that statement was not accurate. *Id*. Jennings also stated that after the argument, he had walked out of the residence with Lisa's daughter and gone into his garage for the evening, though Lisa's daughter stated this was not accurate. *Id*. Lisa's daughters also stated that when they saw Brad after the shooting, he was wearing different clothing, and looked as though he had "cleaned up" and possibly taken a shower. *Id*. In a later interview, Jennings admitted that the couple was experiencing marital problems and that he had struck Lisa in the past. *Id*. He also admitted to being intoxicated the night of Lisa's death, and that he had moved the body, which he claimed "looks bad doesn't it." *Id*. The probable cause statement included Nash and Renken's bloodstain pattern analysis, as well as the MSHP Crime Lab's conclusions that Jennings' robe

and slippers contained bloodstain pattern, including "atomized blood," which Nash stated suggested resulted from a "misting effect" caused by a gunshot wound, indicating Jennings was present when the gun was discharged.

Though Jennings has presented evidence that seriously calls into question the accuracy of Nash and Renken's bloodstain analysis, there is no evidence that this analysis was knowingly false or performed in bad faith. *See Zike v. Advance Am., Cash Advance Centers of Missouri, Inc.*, 646 F.3d 504, 511 (8th Cir. 2011) (concluding Missouri law required plaintiff to present evidence that a witness at a preliminary hearing was aware that her testimony was false); *Kvasnicka v. Montgomery Ward & Co.*, 166 S.W.2d 503, 511 (Mo. 1942) (finding that while plaintiff had presented evidence that handwriting experts were mistaken in their opinion that it was her who had forged the check, there was no evidence that the testimony was both "false and known to be false" and therefore did not support a claim of lack of probable cause). Although factoring in the negative GSR results and Lisa's suicide attempt as a teenager does reduce the level of probability evidenced by the facts, under Missouri law a reasonable officer could still conclude probable cause existed that Jennings murdered his wife. *See, e.g., State v. Parsons*, 513 S.W.2d 430, 440 (Mo. 1974) (finding probable cause to arrest defendant for homicide of his ex-wife where it appeared that there was a personal motive for the crime, that the defendant and decedent previously had marital difficulties, and that defendant acted suspiciously prior to and after the decedent's death by giving inconsistent statements about his recent handling of dynamite, indicating he had something to hide); *State v. Vinzant*, 716 S.W.2d 367, 371 (Mo. Ct. App. 1986) (finding that where the sole information incriminating defendant was that he had previously argued with his mother over his unauthorized absence from military service, and that on the night before his mother's murder the two were overheard arguing, this was sufficient to

support the arrest of the defendant for the murder); *State v. Love*, 546 S.W.2d 441, 450 (Mo. Ct. App. 1976) (evidence that the defendant had scratches on his arm, that he was present in the apartment adjacent to where the homicides occurred, that he appeared to have changed his clothes, that he appeared nervous while being questioned, and that a person matching his description was seen near the door to the apartment where the murders had occurred was sufficient probable cause for his arrest). Because there was probable cause for Jennings' arrest, Nash's motion for summary judgment on Jennings' false arrest claim is granted.

### g. COUNT VII – Missouri Malicious Prosecution claim against Defendant Nash

A claim for malicious prosecution in Missouri requires proof of "(1) the commencement of a prosecution against the plaintiff; (2) instigation by the defendant; (3) termination of the proceeding in favor of the plaintiff; (4) the want of probable cause for the prosecution; (5) [that] the defendant's conduct was actuated by malice [;] and (6) that the plaintiff was damaged." *Cassady v. Dillard Dept. Stores*, 167 F.3d 1215, 1219 (8th Cir. 1999) (quoting *Bramon v. U–Haul, Inc.*, 945 S.W.2d 676, 684 (Mo. Ct. App. 1997)).

As with the false arrest claim, Nash and Jennings only argue whether the prosecution lacked probable cause, and the Court has already determined probable cause existed when Jennings was arrested. Further, for a malicious prosecution claim "an examining magistrate's finding of probable cause at a preliminary hearing, and subsequent 'binding over' of the defendant for trial" constitutes prima facie evidence of probable cause to have commenced criminal proceedings against Jennings. *Zike*, 646 F.3d at 510. Here, it is undisputed that the Dallas County Circuit Court found probable cause and bound over Jennings for trial. Doc. 154-17.

"[T]he Missouri Supreme Court has only recognized one way [] to rebut this prima facie evidence which [is] to show that the examining magistrate's finding at the hearing was procured through false or fraudulent testimony." *Zike*, 646 F.3d at 510–11.  Jennings asserts that Nash "falsely formulate[d] a pretense of probable cause" by omitting facts from his crime scene report, contending he was unaware of the GSR results, attempting to "nullify the anticipated trial testimony of Scott Rice," and "alter[ing] of Lisa's computer and/or hard drives."[8]  Doc. 160, pp. 32–33.

With respect to the computer and hard drives, as discussed above, Plaintiff has produced no evidence from which the Court can assess what information was on the hard drives and whether it would add to or detract from the probable cause finding.  As to the alleged attempts to discredit Rice as a defense witness, almost all of these actions took place after Nash submitted his probable cause statement on July 27, 2009, and Jennings does not explain how the allegedly false May 3, 2007 Maddux statement contributed to "falsely formulating a pretense of probable cause" when none of the information contained within it was mentioned in Nash's probable cause statement.  Finally, as discussed above, although Jennings does present evidence that Nash

---

[8] Nash argues that "by stipulating to the probable cause statement, Plaintiff waives any claims of falseness or fraud because he is accepting the facts of the probable cause statement as true." Doc. 166 (Nash's reply in support of his motion for summary judgment), p. 10.  Nash points to Jennings' Dallas County Circuit Court docket which provides, "[p]reliminary hearing held on the record. State offers probable cause statement as State's Exhibit 1. Defendant stipulates to the admission of said statement. State's Exhibit 1." Doc. 154-17.  Nash cites no authority to support his proposition that stipulating to admitting into evidence a probable cause statement constitutes an admission that all facts within the statement are true.  Missouri law indicates otherwise. *See, e.g., Monroe v. Lyons*, 98 S.W.2d 544, 547 (Mo. 1936) (finding that where parties stipulated "that defendants had witnesses who would testify" to certain facts, it did not follow that plaintiffs had stipulated to the truth of the facts within the testimony); *Howard v. Missouri State Bd. of Educ.*, 847 S.W.2d 187, 191 (Mo. Ct. App. 1993) ("A stipulation as to the testimony a witness would give, if called, may constitute evidence of the fact involved, but is not an admission of the truth of such evidence and does not prevent a party from attacking it.")

omitted certain facts and the GSR results from his statement, Missouri law provides that this cannot rebut a prima facie showing of probable cause so long as the basis for probable cause was not false. "The failure to provide every last piece of information in one's possession does not constitute providing false information." *Crow v. Crawford & Co.*, 259 S.W.3d 104, 116 (Mo. Ct. App. 2008) (finding a Plaintiff could not rebut the prima facie showing of probable cause "even assuming arguendo that the Defendants did not disclose some potentially exculpatory evidence, as this does not show that they provided false information.") Therefore, because Nash has presented a prima facie case of probable cause and Jennings has failed to rebut this showing, Nash's motion for summary judgment as to Jennings' malicious prosecution claim is granted.

## V.    CONCLUSION

For the reasons discussed above, the motions for summary judgment by Defendants Knowles, Rackley, and Dallas County are granted. Defendant Nash's motion for summary judgment is denied as to Count I, but granted on Counts II, III, VI, and VII.

s/ Nanette K. Laughrey_____
NANETTE K. LAUGHREY
United States District Judge

Dated:  January 15, 2020
Jefferson City, Missouri